**O**

# United States District Court
# Central District of California

| | |
|---|---|
| KAROLINA OCHOA, individually, and on behalf of a class of similarly situated individuals,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>CHURCH & DWIGHT CO., INC.,<br>　　　　　　Defendant. | Case № 5:17-cv-02019-ODW (SP)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [20]** |

## I.   INTRODUCTION

Pending before the Court is Defendant Church & Dwight Co., Inc.'s Motion to Dismiss (Mot., ECF No. 20) Plaintiff Karolina Ochoa's Class Action Complaint (Compl., ECF No. 1).[1]   For the reasons explained below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion.

## II.   FACTUAL BACKGROUND

This is a consumer product class action.  Ochoa alleges that Church & Dwight understates the amount of folic acid, per serving, on the label of its Vitafusion™

---

[1] After considering the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15.

PreNatal Multivitamin Gummy ("Prenatal Gummies"), in violation of the Food and Drug Administration's ("FDA") regulations, specifically 21 U.S.C. § 343(a)(1), which declares food misbranded if its "labeling is false and misleading in any particular." (Compl. ¶¶ 2, 10, 69.)   Ochoa further alleges that Church & Dwight's failure to comply with FDA regulations violates various California consumer protection statutes—the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, the False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*, and the Consumer's Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.* (*Id*. ¶¶ 66, 73, 77, 82, 87.)   Additionally, Ochoa asserts claims against Church & Dwight for breach of express warranty, Cal. Com. Code § 2313, breach of implied warranty of merchantability, Cal. Com. Code § 2314, and restitution based on quasi-contract/unjust enrichment.  (*Id*. ¶¶ 50, 62, 96.)

Ochoa alleges that she purchased three bottles of the Prenatal Gummies during her pregnancy in 2016, and that she "relied on the representation that the [Prenatal] Gummies were healthful and contained the amount of vitamins and nutrients represented on the label."  (*Id*. ¶¶ 14, 30.)   However, Ochoa also alleges that "independent laboratory testing" revealed that the Prenatal "Gummies contained folic acid in excess of the amounts represented on the label."  (*Id*. ¶¶ 28, 31.)  Specifically, the label denotes 800 mcg of folic acid per serving, whereas laboratory test results found folic acid amounts between 1,100 mcg and 2,047 mcg.  (*Id*. ¶ 28.)  According to Ochoa, the upper tolerable intake limit for folic acid is 1000 mcg, and exceeding this limit has severe consequences.  (*Id*. ¶¶ 7–8.)  Ochoa asserts that she would not have purchased the Prenatal Gummies "[h]ad she of known the truth about the dangers of the Gummies[.]"  (*Id*. ¶ 32.)  Lastly, Ochoa seeks to represent a class consisting of all consumers nationwide who purchased the Prenatal Gummies, or alternatively, a California sub-class, consisting of all consumers in California who purchased the Prenatal Gummies.  (*Id*. ¶¶ 40(a)–(b).)

Ochoa filed her Class Action Complaint on October 3, 2017.  (*See generally id.*)  Church & Dwight moved to dismiss the Complaint on December 1, 2017.  (*See generally* Mot.)  By the present motion, Church & Dwight moves to dismiss the entire action for lack of subject-matter jurisdiction pursuant to the doctrine of standing,[2] and for failure to state a claim pursuant to the doctrines of preemption and primary jurisdiction.  (*See id.*)  Ochoa filed her opposition on January 8, 2018 (Opp'n, ECF No. 22), and Church & Dwight replied on January 12, 2018 (Reply, ECF No. 24).  Both parties request the Court to take judicial notice of a number of documents to support their briefs, to which no party objects.  (*See* ECF Nos.  21, 23, 25.)

## III.   LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 12(b)(2)

In determining whether the exercise of personal jurisdiction over a nonresident defendant is proper, a district court must apply the law of the state in which it sits when there is no applicable federal statute governing personal jurisdiction. *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).   District courts in California may exercise personal jurisdiction over a nonresident defendant to the extent permitted by the Due Process Clause of the Constitution.   Cal. Code Civ. Proc. § 410.10.   The Due Process Clause of the Fourteenth Amendment requires that the defendant have "certain minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) (citations and internal quotation marks omitted).   The party seeking to invoke jurisdiction has the burden of establishing that jurisdiction exists. *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1392 (9th Cir. 1984).

Personal jurisdiction may be founded on either general jurisdiction or specific

---

[2] As will become apparent below, the Court disagrees with Church & Dwight's characterization of its "standing" argument.  Rather, the Court finds that the proper analysis of this legal issue falls under Federal Rule of Civil Procedure 12(b)(2) (i.e., personal jurisdiction), which more closely follows the analysis of the cases cited by Church & Dwight.  (*See* Mot. at 11.)

jurisdiction. General jurisdiction exists when a defendant is domiciled in the forum state or his activities in the forum are "substantial" or "continuous and systematic." *Panavision*, 141 F.3d at 1320. When the nonresident defendant's contacts with the forum are insufficiently pervasive to subject it to general personal jurisdiction, the court must ask whether the "nature and quality" of its contacts are sufficient to exercise specific personal jurisdiction over it. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1287 (9th Cir. 1977). A court may exercise specific personal jurisdiction over a nonresident defendant if (1) the nonresident defendant purposefully directs his activities at the forum or performs some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the plaintiff's claim arises out of the forum-related activities of the nonresident defendant; and (3) the exercise of jurisdiction over the nonresident defendant is reasonable. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

**B.     Federal Rule of Civil Procedure 12(b)(6)**

A complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The determination whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). But a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). The court must dismiss a complaint that does not assert a cognizable legal theory or fails to plead sufficient facts to support an otherwise cognizable legal theory. Fed. R. Civ. P. 12(b)(6); *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

**C.     Federal Rule of Civil Procedure 9(b)**

In addition, where, as here, the plaintiff's claim sounds in fraud, the complaint must comply with Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.   *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *Bly-Magee v. Cal.*, 236 F.3d 1014, 1018 (9th Cir. 2001).   Rule 9(b) requires the party alleging fraud to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), including "the who, what, when, where, and how of the misconduct charged." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010) (internal quotation marks omitted); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).   "In addition, the plaintiff must set forth what is false or misleading about a statement, and why it is false." *Ebeid*, 616 F.3d at 998 (citations, brackets, and internal quotation marks omitted).   "Rule 9(b) serves to give defendants adequate notice to allow them to defend against the charge and to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect professionals from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996) (citations, brackets, and internal quotation marks omitted).

**D.     Leave to Amend**

When a motion to dismiss is granted, the court must decide whether to grant leave to amend. The Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted. *See, e.g.*, *DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).   However, a court need not grant leave to amend when permitting a plaintiff to amend would be an exercise in futility. *See, e.g.*, *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile."); *Lopez v. Smith*, 203 F.3d

1122, 1127 (9th Cir. 2000).

## IV.    DISCUSSION

### A.    Requests for Judicial Notice

The Court first addresses the pending requests for judicial notice submitted by the parties. (ECF Nos. 21, 23, 25.) While a district court generally may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion, a court may consider any documents referenced in the complaint, and may take judicial notice of matters in the public record, without converting a motion to dismiss into one for summary judgment. *See Lee*, 250 F.3d at 688–89.

Church & Dwight requests the Court to take judicial notice of an FDA guide entitled "Dietary Supplement Labeling Guide (April 2005)," *available at* https://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegGuidanceDo cumentsR/DietarySupplements/ucm070616.htm. (ECF No. 21.) In support of her opposition to Church & Dwight's Motion, Ochoa requests that the Court take judicial notice of a consumer update guide entitled "Consumer Update: Fortify Your Knowledge About Vitamins (February 21, 2009)," *available at* https://www.fda.gov/ForConsumers/ConsumerUpdates/ucm118079.htm. (ECF No. 23.) Lastly, in support of its Reply, Church & Dwight requests that the Court take judicial notice of an excerpt from an entry in the Federal Register entitled "Current Good Manufacturing Practices in Manufacturing, Labeling, or Holding Operations for Dietary Supplements," found at 72 Fed. Reg. 34,752, 34,883-84 (June 25, 2007) (codified at 21 C.F.R. pt. 111). (ECF No. 25.)

Church & Dwight's "supplement labeling guide" and Ochoa's "consumer update guide" are matters of public record and are, therefore, appropriate for judicial notice. *See Hansen Beverage Co. v. Innovation Ventures, LLC*, No. 08-cv-1166, 2009 WL 6597891, at *2 (S.D. Cal. Dec. 23, 2009) (taking judicial notice of documents made available to the public on government agency websites); *see also Paralyzed Victims of Am v. McPherson*, No. 06-cv-4670, 2008 WL 4183981, at *5 (N.D. Cal.

Sept. 8, 2008) (finding judicial notice appropriate for information obtained from government websites).  The Court also finds Church & Dwight's "current good manufacturing practices" excerpt from the Federal Register appropriate for judicial notice.  *See Muller v. Morongo Casino, Resort, and Spa*, No. 14-2308, 2015 WL 3824160, at *4 (C.D. Cal. June 7, 2015) (noting that a district court may take judicial notice of the Federal Register and the Code of Federal Regulations).

Accordingly, the Court **GRANTS** Church & Dwight and Ochoa's requests for judicial notice.  (ECF Nos. 21, 23, 25.)

**B.     Preemption**

1.     *UCL, CLRA, and FAL Claims*

Church & Dwight argues that the Court should dismiss this action in its entirety because Ochoa's state law claims are expressly preempted by federal law, namely the Food, Drug, and Cosmetic Act ("FDCA") and the Nutrition Labeling and Education Act ("NLEA"), which impose requirements specifically governing food[3] nutrition content labeling.  (Mot. at 4-7.)  Express preemption applies where Congress has specifically stated in the statutory language that its enactments preempt state law. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78 (1990).  The FDCA, as amended by the NLEA, contains an express preemption provision, making clear that state laws imposing labeling requirements not identical to FDA mandates are preempted.  21 U.S.C. § 343-1(a); 21 C.F.R. § 100.1(c)(4) (in this context, "not identical to" means "that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food [that] . . . [a]re not imposed by or contained in the applicable [federal statute or regulation] . . . or [d]iffer from those specifically imposed by or contained in the applicable [federal statute or regulation]").  However, "where a requirement imposed by state law effectively parallels or mirrors the relevant sections of the NLEA, courts have repeatedly refused

---

[3] Under the Dietary Supplement Health and Education Act of 1994 (the, "DSHEA"), 21 U.S.C. § 321 (ff), "a dietary supplement shall be deemed to be a food within the meaning of [the FDCA]."

to find preemption." *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1118 (N.D. Cal. 2010); *see also Brazil v. Dole Food Co., Inc.*, 935 F. Supp. 2d 947, 958 (N.D. Cal. 2013). Therefore, a plaintiff's claims do not fail on preemption grounds if the requirements she seeks to impose are identical to those imposed by the FDCA, NLEA, or applicable FDA regulations.

The FDCA and California law contain identical prohibitions on false or misleading labeling. *Compare* Sherman Law, Article 6 § 110660, *with* FDCA § 403(a)(1), 21 U.S.C. § 343(a)(1) (both identically provide that food is misbranded if its "labeling is false or misleading in any particular"); *see also* Cal. Health & Safety Code § 110100(a) ("All food labeling regulations and any amendments . . . to the federal act, in effect on January 1, 1993, or adopted after that date shall be the food labeling regulations of this state"). In short, California and federal law are identical and Ochoa's claims would be preempted only if the consequence of those claims implied or suggested a difference.

For dietary supplement products, the FDCA requires that the "list of dietary ingredients shall include the quantity of each such ingredient per serving[.]" 21 U.S.C. § 343(q)(5)(F)(ii). Federal regulations promulgated by the FDA further require "[t]he declaration of folic acid shall be included as a quantitative amount by weight when added as a nutrient supplement or a claim is made about the nutrient." 21 C.F.R. § 101.9(c)(8)(ii). "A food with a label declaration of a vitamin . . . shall be deemed to be misbranded under section 403(a) of the FDCA unless it meets the following requirement . . . [w]hen a vitamin . . . meets the definition of a Class I nutrient,[4] the nutrient content of the composite must be formulated to be at least equal to the value for that nutrient declared on the label." *Id.* § 101.9(g)(4)(i). Furthermore,

---

[4] *Compare* 21 C.F.R. § 101.9(g)(3)(i) (Class I vitamins are "[a]dded nutrients in fortified or fabricated foods"), *with id.* § 101.9(g)(3)(ii) (Class II vitamins are "[n]aturally occurring (indigenous) nutrients"). The Court considers the Prenatal Gummies to be Class I vitamins because "[t]he synthetic form of folate found in supplements and fortified foods is known as folic acid." (Compl. ¶ 4.)

8

a "safe harbor" provision provides that "[r]easonable excesses of vitamins . . . over labeled amounts are acceptable within current good manufacturing practice." *Id.* § 101.9(g)(6).  The FDA has commented that "[w]e understand that some firms design products using an additional amount of certain ingredients to ensure the product meets its specifications for the amount of the ingredient during the expected shelf life of the product . . . We also understand it would be more appropriate to refer to the additional amount as an 'overage' amount rather than an 'excess' amount, because 'overage' is commonly used in the industry[.]"  Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements, 72 Fed. Reg. 34752, 34884 (June 25, 2007) (to be codified at 21 C.F.R. pt. 111).  The FDA has also noted that they do not intend "to allow a manufacturer to add excess dietary ingredients in unspecified amounts that would be in excess of the amount actually needed to meet the label declaration."  Current Good Manufacturing Practice in Manufacturing, Packing, or Holding Dietary Ingredients and Dietary Supplements, 68 Fed. Reg. 12158, 12203 (Mar. 13, 2003) (proposed rule).  Lastly, compliance with the food labeling requirements under section 101.9(c)(8)(ii) is determined based on specific testing methodology described in section 101.9(g)(2).  Section 101.9(g)(2) requires "[t]he sample for nutrient analysis . . . consist of a composite of 12 different randomly chosen shipping cases, to be representative of a lot."

Preemption is an affirmative defense, so it is Church & Dwight's burden to establish that it applies.  *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007) ("[F]ederal preemption is an affirmative defense upon which the defendants bear the burden of proof" (quoting *Fifth Third Bank v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005))); *see also Moore v. Young Bros., Ltd.*, 289 F. App'x 149, 152 (9th Cir. 2008) (noting the general rule that federal preemption is an affirmative defense to a state law claim).  Church & Dwight argues that Ochoa "seeks to impose a labeling requirement that is not 'identical' to the FDA supplement label regulations."  (Mot. 5.)  Specifically, Church & Dwight argues that "in [Ochoa's]

interpretation, the UCL, CLRA, and FAL prohibit Church & Dwight from stating a per-serving folate content on the [Prenatal Gummies] label that is less than the actual amount of folate per serving, [while] the governing FDA regulation expressly allows for a supplement to contain excess amounts of vitamins over the stated amount on the label." (*Id.* at 6 (citing 21 C.F.R. § 101.9(g)(6).)  In response, Ochoa argues that her allegations are "entirely consistent" with section 101.9(g)(6), noting that "the Complaint clearly explains that the wrongdoing alleged is based on [Church & Dwight] 'materially exceeding the representation on the product label' along with the 'tolerable upper limit for folic acid.'"  (Opp'n 8 (citing Compl. ¶ 28).)

The Court finds that Ochoa's claims are preempted for two reasons.  First, she has not pled that the excess (or overage) is unreasonable and not consistent with good manufacturing practices for insuring that the folate level does not fall below the label amount during the product's shelf life.  Rather, Ochoa merely makes mention of "a materially significant amount in excess" that "significantly exceeds the tolerable upper limit for folic acid."  (Compl. ¶¶ 28, 69.)  The regulations do not embody these standards, thus Ochoa seeks to impose requirements that plainly are not in the regulations.  *See Ivie v. Kraft Foods Global*, 961 F. Supp. 2d 1033, 1042 (N.D. Cal. 2013) (finding preemption because "[a]llowing plaintiff's state law claim to proceed would mean reading California's Sherman Laws to impose an additional or different regulatory requirement on defendants' product" than federal law imposes).  Second, Ochoa has not pled that she tested the Prenatal Gummies in accordance with the random 12-sample composite method, as set forth in 21 C.F.R. § 101.9(g)(2).  *See Bruaner v. MusclePharm Corp.*, No. 14-cv-88690, 2015 WL 4747941, at *9 (C.D. Cal. Aug. 11, 2015) (granting motion to dismiss claims based on defendant's failure to list all ingredients on product label where plaintiff failed to allege that the testing upon which he relied was conducted in accordance with FDA regulations); *Salazar v. Honest Tea, Inc.*, 74 F. Supp. 3d 1304, 1313–14 (E.D. Cal. 2014) (granting motion to dismiss claim based on allegedly misleading antioxidant level claims where plaintiff

1   failed to allege that the independent testing on which she relied had been conducted in

2   accordance with FDA regulations).

3         Thus, the Court finds that Ochoa's UCL, CLRA, and FAL claims based on the

4   allegedly mislabeled folic acid claim, as currently pled, are preempted.  Accordingly,

5   the Court **GRANTS** Church & Dwight's motion to dismiss to the extent it seeks to

6   dismiss Ochoa's claims on the basis of preemption.  Because Ochoa could amend her

7   complaint to correct this deficiency, however, the Court **GRANTS** her leave to

8   amend.

9         2.    *Remaining State Law Claims*

10        Church & Dwight argues that Ochoa's remaining state law claims (breach of

11  express warranty, breach of implied warranty of merchantability, and unjust

12  enrichment) must also be dismissed because they are "premised on the same

13  allegations as the UCL, CLRA, and FAL claims, namely that the [Prenatal Gummies]

14  contain more folate per gummy than is listed on the label[.]"  (Mot. 8.)  Church &

15  Dwight further contends that the unjust enrichment claim must also be dismissed

16  because "it is not an independent cause of action[.]"  (*Id*.)  In response, Ochoa argues

17  that her unjust enrichment claim is properly pled because it is based on a theory of

18  quasi-contract.  (Opp'n 16.)

19        The Court agrees with Church & Dwight that Ochoa may not proceed with her

20  breach of express and implied warranty claims because they are based on the

21  mislabeled folic acid claim that the Court finds preempted under 21 C.F.R. § 101.9(g).

22  *See Fisher v. Monster Beverage Corp.*, No. 12-cv-2188, 2013 WL 4804385, at *14–

23  15 (C.D. Cal. July 9, 2013) (dismissing implied warranty claim as preempted because

24  it was based on the adequacy of labeling preempted by UCL, CLRA, and FAL

25  claims); *see also Backus v. Nestle USA, Inc.*, 167 F. Supp. 3d 1068, 1076 (N.D. Cal.

26  2016) (dismissing express warranty claim as preempted along with preempted UCL,

27  CLRA, and FAL claims).

28

The Court, however, disagrees with Church & Dwight's contention that the unjust enrichment claim must be dismissed because it is not an independent cause of action.  When a plaintiff alleges unjust enrichment, a court may "construe the cause of action as a quasi-contract claim seeking restitution."  *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th 221, 231 (2014).  Unjust enrichment describes "the theory underlying a claim that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request.  The return of that benefit is the remedy typically sought in a quasi-contract cause of action." *Astiana v. Hain Celestial Group, Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (internal quotation marks and citations omitted); *see Munoz v. MacMillan*, 195 Cal. App. 4th 648, 661 (2011) ("Common law principles of restitution require a party to return a benefit when the retention of such benefit would unjustly enrich the recipient; a typical cause of action involving such remedy is quasi-contract."); *see also ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016) ("To allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense."); *accord Bruton v. Gerber Products Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (under California law, a plaintiff may pursue a claim for unjust enrichment as an independent standalone cause of action).

Here, Ochoa alleges in her Class Action Complaint that she is entitled to relief under a "quasi-contract" cause of action because Church & Dwight "took monies from [Ochoa] for products promised to contain a specific amount of folic acid which it did not.  [Church & Dwight] has been unjustly enriched at the expense of [Ochoa] as a result of its unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on [Church & Dwight] to restore these ill-gotten gains to [Ochoa.]" (Compl. ¶ 96.)  The Court finds this allegation sufficient to state a quasi-contract cause of action.  Even as a quasi-contract claim, however, this cause of action falls short, because it is also preempted for the same reasons as discussed above.

1    Accordingly, the Court **GRANTS** Church & Dwight's motion to dismiss to the

2    extent it seeks to dismiss Ochoa's remaining state-law claims.   The Court also

3    **GRANTS** Ochoa leave to amend these claims to address the deficiencies.

4    **C.    Primary Jurisdiction**

5    Church & Dwight asks the Court to dismiss or stay Ochoa's case pursuant to

6    the primary jurisdiction doctrine.  (Mot. 13–14.)  Church & Dwight argues that "even

7    if [Ochoa] were permitted an opportunity to re-plead, the FDA's expertise and

8    experience with folate levels and good manufacturing practice in the vitamin

9    supplement field, as well as the FDA's expertise with its own regulation regarding

10   vitamin levels in excess of the amount stated on vitamin product labels makes the

11   FDA the appropriate body to resolve any issue regarding the [Prenatal Gummies] label

12   compliance with FDA regulations."  (*Id*.)  Church & Dwight further argues that

13   resolution of whether a vitamin overage is "reasonable" within "good manufacturing

14   practice" requires an assessment by one with scientific expertise and industry

15   experience to determine whether the amount of a vitamin, such as folate, listed on a

16   product label accurately reflects the minimum amount of the vitamin that remains in

17   the product throughout its entire shelf-life so that the nutrient content is "at least equal

18   to the value for that nutrient declared on the label."  (*Id*. at 13 (citing 21 C.F.R.

19   § 101.9(g)(4)).)

20   In response, Ochoa argues that "deference to the FDA on the basis of primary

21   jurisdiction is not warranted."  (Opp'n 9.)   Ochoa asserts that her case "is

22   fundamentally one about mislabeling—an inquiry which courts are quintessentially

23   capable of adjudicating."  (*Id*.)  Alternatively, Ochoa contends that "even if the case

24   involves application of [current good manufacturing practices ("cGMPs")] referenced

25   in 21 C.F.R. § 101.9(g)(6), these are not highly technical, scientific inquiries requiring

26   FDA input, but rather only application of the facts to well established regulations.

27   cGMPs have been in existence for 10 years . . . they present no issues of first

28

impression, and the FDA is not actively considering modifying any cGMP at issue in this litigation." (*Id*. at 9–10.)

"The primary jurisdiction doctrine allows courts to stay proceedings or to dismiss a complaint without prejudice pending the resolution of an issue within the special competence of an administrative agency." *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008).  The doctrine "is committed to the sound discretion of the court when 'protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.'" *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 781 (9th Cir. 2002) (quoting *United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir. 1987)). Courts apply the following factors in determining whether to apply this doctrine: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that (4) requires expertise or uniformity in administration." *Id.*  Not all issues within an agency's purview must be referred to that agency; rather, "[p]rimary jurisdiction is properly invoked when a claim . . . requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency." *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1172 (9th Cir. 2002); *accord Hood v. Wholesoy & Co., Modesto Wholesoy Co. LLC*, No. 12-cv-550, 2013 WL 3553979, at *5 (N.D. Cal. July 12, 2013).  Courts within this circuit have also considered whether the agency is actively engaged in rulemaking or adjudication on the issue presented before invoking primary jurisdiction.  *See, e.g.*, *Reid v. Johnson & Johnson*, 780 F.3d 952, 967 (9th Cir. 2015) (declining to refer the dispute to the FDA based on the primary jurisdiction doctrine when there was "no indication that the FDA [was] contemplating authorizing" further statements on the relevant issues); *Clark*, 523 F.3d at 1115 (upholding district court's invocation of the

primary jurisdiction doctrine when the applicable agency was "actively considering" how to regulate the issues presented in the case).

Here, all four factors support the application of the doctrine. Ochoa's state claims raise the technical issue of whether the Prenatal Gummies are in compliance with 21 C.F.R. § 101.9(g)(6)—particularly, whether the overage amount of folic acid, over the stated label amount, is a "reasonable excess" "within current good manufacturing practice." First, Congress has enacted a comprehensive scheme to maintain uniformity in food labeling (including dietary supplements) and has delegated the authority of administering it to the FDA. *See generally* 21 U.S.C. §§ 343, 343-1(a); *see also Kelley v. WWF Operating Co.*, No. 17-cv-117, 2017 WL 2445836, at *4 (E.D. Cal. June 6, 2017). Second, as Church & Dwight points out, resolving this case would "require technical analysis of . . . the rate at which folate amounts diminish over the product's declared shelf life, and how much folate must be included in each serving of the product to insure that consumers who purchase the product at all stages of its shelf life receive at least the label amount of folate per serving." (Reply 8); s*ee also* 21 C.F.R. § 101.9(g)(4)(i).

Ochoa contends, on the contrary, that the current good manufacturing processes "referenced in 21 C.F.R. § 101.9(g)(6) don't raise technical issues that would require interpretive expertise of the FDA." (Opp'n 12.) To support her argument, Ochoa notes that the current practices were the result of a collaborative 10-year process, pointing out that in 2003 the FDA drafted and issued a proposed rule governing manufacturing practices for dietary supplements. (*See id*.) In fact, as noted above, in the commentary to the proposed rule referenced by Ochoa, the FDA emphasized that "[w]e recognize that some manufacturers intentionally add a specific amount of dietary ingredient in excess of the declared label so that the finished product can meet the label declaration for that dietary ingredient throughout the product's shelf life . . . This provision is not intended to allow a manufacturer to add excess dietary ingredients in unspecified amounts that would be in excess of the amount actually

needed to meet the label declaration."   Current Good Manufacturing Practice in Manufacturing, Packing, or Holding Dietary Ingredients and Dietary Supplements, 68 Fed. Reg. 12158, 12203 (March 13, 2003).   Thus, Ochoa is correct, that as of 2003, the FDA explicitly declined to opine on what constituted an appropriate overage amount to meet the label declaration.[5]

However, more recently, the FDA has responded to this issue, indicating that further research is necessary.   In commentary to newer proposed regulations, the FDA has stated the following:

> Although we did not receive any comments on our proposed revisions to the compliance requirements in § 101.9(g)(6), we did receive a number of comments related to Class I and Class II nutrients . . .   The comments said that degradation can occur faster in some nutrients than others with certain matrices.   The comments expressed concern that firms may include large excesses (greater than 120 percent of the declared amount) to remain in compliance with requirements for Class I nutrients and other dietary ingredients over the shelf life of the product . . .   We acknowledge the comments' arguments for revising our compliance requirements for Class I nutrients, but decline to revise the rule to allow for less than 100 percent of the amount declared on the label . . .   This is a complex issue that warrants further consideration.   We need to further consider and review the available information and to make a determination whether to propose changes with respect to the requirements for Class I nutrients and/or other requirements that may be affected . . .   [Moreover,] one

---

[5] The FDA did provide a hypothetical referencing a 10 percent overage amount, however, the Court does not draw from this that 10 percent is the only permissible overage amount.   *See* Current Good Manufacturing Practice in Manufacturing, Packing, or Holding Dietary Ingredients and Dietary Supplements, 68 Fed. Reg. 12158, 12203 (March 13, 2003) ("For our hypothetical vitamin C tablet, if you added an extra 25 mg of vitamin C to ensure that your product contains at least 250 mg of vitamin C throughout its shelf life, your master manufacturing record would state the component and the actual amount of the component as 'Vitamin C, 250 mg, (10 percent excess) 25 mg' or '275 mg of Vitamin C.'")

> comment referred to a statement made in the preamble to the proposed rule that we expect that, when a food product contains . . . added folic acid, the declared amount must be at least equal to the amount of the nutrient added to the food . . . We agree that there could be process losses or losses over shelf life for some nutrients added to a product. Product loss over the shelf-life of a product is a complex issue that warrants further review. We need additional time to review the available information and to make a determination whether to propose changes with respect to the requirements for Class I nutrients and/or other requirements that may be affected."

Food Labeling: Revision of the Nutrition and Supplement Facts Labels, 81 Fed. Reg. 33742, 33964–65 (May 27, 2016).

In the Court's view, this commentary is an indication that the FDA is contemplating additional guidance on the issue. *See Reid*, 780 F.3d at 967. To be sure, Ochoa's claims lie at the interstices of the existing regulations, as the FDA has not yet provided specific guidance on labeling requirements regarding what is an appropriate amount of product overage that is necessary to cover product loss over the shelf-life of a specific supplement. Further, it is evident from the FDA's commentary that it is assuming the role of deciding overage requirements or restrictions for Class I nutrients. Perhaps most importantly, it is clear that the FDA has consciously refrained from establishing a precise guideline for overage amounts based by supplement type and claimed weight amount per serving. In the absence of such a clear regulation by the FDA, should this Court go forward with determining what is a "reasonable" overage amount "within current good manufacturing practice," "it would find itself in a position of either having no set standard to apply, or announcing a standard and thereby overstepping its proper role." *Hood*, 2013 WL 3553979, at *6 (finding that it was appropriate to defer to the authority and expertise of the FDA to say what the appropriate rules should be with respect to "soy yogurt" and "evaporated cane juice" where the plaintiff brought a class action alleging that the defendant's products did not

comply with the requirements of the FDCA as adopted by the California Sherman Law).  Therefore, "[r]endering a decision based on what this Court believes the FDA might eventually decide on [this issue] would usurp the FDA's interpretive authority." *Id* (internal quotation marks and citations omitted); *see also Haggag v. Welch Foods, Inc.*, No. 13-cv-0341, 2014 WL 1246299, at *6 (C.D. Cal. March 24, 2014) ("Since the FDA explicitly stated that there is no bright-line definition for implied health claims, which must be evaluated on a case-by-case basis, decisions as to implied health claims are best left to the FDA, which can determine such claims uniformly."). Thus, the Court finds that it would be inappropriate to decide the issue, which is committed to the FDA's expertise, "without a clear indication of how the FDA would view the issue."  *Watkins v. Vital Pharmaceuticals, Inc.*, No. 12-cv-9374, 2013 WL 5972174, at *3 (C.D. Cal. Nov. 7, 2013).

Accordingly, to the extent Ochoa's theory of mislabeling, once amended, implicates complex technical or policy questions regarding when a dietary supplement's overage amount is reasonable within current good manufacturing practices, that may be a question better addressed, in the first instance, by the FDA. The Court defers to the FDA for resolution of the issue.  *See General Dynamics*, 828 F.2d at 1362 (holding that "it is the extent to which Congress, in enacting a regulatory scheme, intends an administrative body to have the first word on issues arising in judicial proceedings that determines the scope of the primary jurisdiction doctrine").

However, the Court finds dismissal under the doctrine inappropriate due to the potential prejudice Ochoa would suffer as a result of the passing of the statute of limitations.  *Astiana*, 783, 783 F.3d at 762.  The Court therefore elects to stay the case rather than dismiss it.  Hence, the Court **GRANTS** Church & Dwight's motion to dismiss to the extent that that it seeks to stay this action pursuant to the doctrine of primary jurisdiction.

**D.     Jurisdiction Over Non-Resident Absentee Class Members**

Lastly, Church & Dwight maintains that Ochoa "lacks standing to bring consumer fraud claims on behalf of any plaintiffs other than from California[.]" (Mot. 9.)  Specifically, Church & Dwight argues that the recent United States Supreme Court decision in *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773 (2017) ("*BMS*"), alters the analysis regarding the exercise of personal jurisdiction over a non-resident defendant.  (*Id.* at 10.)  Ochoa contends that Church & Dwight's reliance on *BMS* is misplaced.  (Opp'n 18.)

In *BMS*, a group of plaintiffs, consisting of California residents and predominately non-California residents, filed suit as a mass tort action in state court alleging injuries caused by a pharmaceutical drug manufactured by Bristol-Myers. *BMS*, 137 S. Ct. at 1778.  The Supreme Court held that California did not have personal jurisdiction over the defendant with regard to the claims of the non-California residents.  *Id.* at 1783.  The Supreme Court arrived at its decision based on the existing Fourteenth Amendment due process analysis for specific jurisdiction.  *See id.* at 1783–84.  The Supreme Court found that the non-resident plaintiffs established no connection to the forum state, namely because Bristol-Myers was incorporated in Delaware and headquartered in New York, and because the non-resident plaintiffs did not allege that they were injured by the drug in California or were prescribed or obtained/ingested the drug in California.  *Id.* at 1783–84, 1778.  The Supreme Court concluded that "all the conduct giving rise to the nonresidents' claims occurred elsewhere."  *Id.* at 1782.

Relying on *BMS*, Church & Dwight points out that it is a Delaware corporation with its principal place of business in New Jersey, and that as a result "it can be sued in California only to the extent a particular plaintiff's claims arise out of [it's] contacts with California."  (Mot. 10 (citing Compl. ¶ 15).)  However, *BMS* was not a class action, it was a mass tort action in state court.  This factor alone "materially distinguishes [the current action from *BMS*] because in class actions, the citizenship of

the unnamed plaintiffs is not taken into account for personal jurisdiction purposes." *Fitzhenry-Rusell, et al. v. Dr. Pepper Snapple Grp., Inc.*, No. 17-cv-00564, 2017 WL 4224723, at *5 (N.D. Cal. Sept. 22, 2017) (citing *AM Tr. v. UBS AG*, 78 F. Supp. 3d 977, 986 (N.D. Cal. 2015), *aff'd*, 681 F. App'x 587 (9th Cir. 2017)); *accord Gordon Feller, et al. v. Transamerica Life Ins. Co.*, No. 16-cv-1378, 2017 WL 6496803, at *16–17 (C.D. Cal. Dec. 11, 2017) ("[T]he Court is not persuaded to extend *BMS* to the class action context on these facts.").[6]

In *Fitzhenry-Russell*, all of the named plaintiffs were California residents, and the named plaintiffs sought to represent a nationwide class of Ginger Ale purchasers, even though eighty-eight percent of the class members were not California residents. *Fitzhenry-Russel*, 2017 WL 4224723, at *5.   The *Fitzhenry-Russell* court held that *BMS* did not extend its reasoning to bar the nonresident plaintiffs' claims in a federal nationwide class action because *BMS* "concerned a mass tort action, in which each plaintiff was a named plaintiff." *Id*.  This Court agrees with the analysis in *Fitzhenry-Russel*.  The Supreme Court in *BMS* applied its reasoning to the narrower grounds of personal jurisdiction in the context of mass tort actions.   Thus, its reasoning does not reach so far as to bar the nonresident unnamed class members in the current action.

Accordingly, the Court **DENIES** Church & Dwight's motion to dismiss on these grounds.

///

///

///

---

[6] The Court notes that a class action has different due process safeguards from mass tort actions.  For example, for a case to qualify for class action treatment, it needs to meet the additional due process standards for class certification under Rule 23—numerosity, commonality, typicality, adequacy of representation, predominance and superiority.  Fed. R. Civ. P. 23.  "Often, mass torts cannot qualify for class action treatment because they are unable to satisfy these standards, and at other times, actions can begin as a mass tort but ultimately be resolved as a class action in the settlement context because in that context, manageability concerns are alleviated."   *In re Chinese-Manufactured Drywall Products Liability Litigation*, No. 9-cv-2047, 2017 WL 5971622, at *14 (E.D. La. Nov. 30, 2017) (citing Manual for Complex Litigation § 22.7 (4th ed. 2015)).

## V.    CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** Church & Dwight's Motion to Dismiss with **LEAVE TO AMEND**.  (ECF No. 20.)    Furthermore, the Court hereby **STAYS** this action pending the FDA's determination of reasonable overage amounts within current good manufacturing practices.   Ochoa's counsel shall notify the Court within fourteen (14) days of the FDA's determination, after which Ochoa may amend her Class Action Complaint consistent with this Order and proceed with the remainder of the litigation. Alternatively, if Ochoa does not wish to amend, the parties may submit a proposed judgment to the Court.

**IT IS SO ORDERED.**

January 29, 2018

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**